IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JAMES TALLEY                                                                                    PLAINTIFF

V.                                          CASE NO. 1:11-cv-1044

SHAW MAINTENANCE, INC.                                                            DEFENDANTS

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed on behalf of Defendant Shaw Maintenance Inc. (ECF No. 21). Plaintiff has filed a response. (ECF No. 29). Defendant has replied. (ECF No. 35). The Court finds this matter ripe for consideration.

## BACKGROUND

This action involves claims under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Plaintiff James Talley asserts that his former employer, Defendant Shaw Maintenance, Inc., violated his reemployment rights and unlawfully retaliated against him under the Act.

Talley began working at Shaw's predecessor, JE Merit Construction, Inc., on October 7, 1994. In approximately 2000, Shaw took over JE Merit's contract with Albemarle Corporation, and Talley stayed on in the same or similar capacity. Talley held various positions at Shaw but primarily served as a loader until his termination on September 24, 2010. Throughout his employment, Talley also served in the Arkansas National Guard.

While at Shaw, Talley received numerous hourly-wage increases. On September 25, 2000, he was promoted from loader to foreman and given a pay increase of $1.75 per hour, bringing his

pay to $13.50 per hour. On November 5, 2001, Talley received another pay increase, raising his pay to $14.50 per hour. On May 6, 2002, Talley was demoted back to a loader position, and his pay decreased to $12.06 per hour. After his move back to the loader position, Talley continued to receive increases to his pay. On July 2, 2002, for example, he received a raise of $.36 per hour, increasing his pay to $12.44 per hour.

From October 2003 to April 2007, Talley went on military service leave. In June 2004, he returned to work at Shaw for a brief period before being redeployed and received another pay increase, raising his pay to $12.75 per hour. On April 30, 2007, when Talley returned from his military service leave, Shaw increased his pay again to a rate of $15.00 per hour.

From May 2007 to May 2009, Talley went on military service leave a second time. In June 2007, while Talley was on leave, Shaw implemented a new merit-based component to its compensation system that allowed loaders to earn pay increases for exemplary performance. Under this new merit-based system, loaders received written performance evaluations every six months. To qualify for a merit raise, loaders had to achieve a score of 29 or higher and a score of four in both safety and quality. Top pay for loaders at Shaw without these merit-based increases was $15.00 per hour. Those who qualified for merit increases could receive a $.50 raise after each of their first three evaluations and a $.25 raise after the fourth. Thus, the maximum hourly wage that a loader could receive at Shaw is $16.75 per hour.

During the two-year period that Talley was on military leave, he missed four evaluation periods for merit-based increases. These four evaluation periods allowed other loaders at Shaw to receive merit-based raises. Some loaders missed merit increases during this time for not scoring high enough on their evaluations, but each of them earned at least one merit-based increase while Talley was on leave.

In May 2009, when Talley returned from military leave, he was laid off, along with his entire work unit, due to a reduction in force. Tally and the others in his unit were then rehired in August 2009. Upon rehire, Talley received the same rate of pay of $15 per hour and the same position as loader that he held before his second military leave. Pursuant to Shaw's management structure, Talley and the others in his unit reported to a foreman, Steve Williams, and a supervisor, Daniel Clements, who is a former marine. Clements, in turn, reported to Site Manager Jewell Poindexter.

In August 2009, when Talley returned to Shaw, he was not given a performance evaluation or considered for a merit-based raise. Over the course of several months in late 2009 and early 2010, Talley complained on multiple occasions to Williams, Clements, and Poindexter about his pay. Talley expressed concern that, due to his absence while on military leave, he was making less money than other loaders at Shaw who had less seniority and experience. Poindexter responded that Talley was not eligible for a merit-based raise until Clements completed his performance evaluation. According to Poindexter, Talley was required to work for six months under the new performance based system before being evaluated. Clements conducted Talley's first performance evaluation in March of 2010. On this March 2010 evaluation, Talley did not score high enough to qualify for a merit-based raise due to a February 2010 incident in which he caused damage to a loaded trailer by dropping it on the ground.

On May 20, 2010, Clements counseled Talley for damaging another trailer, and Poindexter and Clements counseled him further regarding Shaw's attendance policy. Shortly after these events, Talley called Shaw's corporate office and complained to HR representative Michael Knowles. During this call and subsequent calls, Talley complained of friction between him and Clements and complained that his pay remained the same in 2009 as it was in 2007. Following

these complaints, Poindexter addressed several employees in a Wednesday morning safety meeting where he stated that employees should not contact Shaw's human-resources department with problems, but should instead attempt to resolve all issues in-house.[1]

On July 15, 2010, acting upon his belief that his complaints to his supervisors and Knowles would not be resolved, Talley filed a formal complaint with the Department of Labor ("DOL"). Poindexter became aware of this DOL complaint on August 9, 2010 when he received a phone call from a DOL investigator, John Donovan.

From September 18 – 20, 2010, approximately six weeks later, Talley was involved in an incident where a bulk trailer failed to reach a customer on time. Poindexter, with the help of Clements, led an investigation into the events surrounding the bulk-trailer incident and found Talley and another employee, Greg Coleman, responsible for the late shipment.[2] Poindexter also believed that Talley was "deceptive" in one of his responses to the bulk-trailer investigation. Talley apparently told Poindexter that he had completed his responsibilities related to the bulk trailer around 1:30 p.m. on the day of the incident, but the time stamp on the paperwork revealed that it was not completed until after 3:00p.m. Clements subsequently recommended to Poindexter that Talley be termination.

Following Clements's recommendation, Poindexter consulted HR representative Knowles seeking advice about whether terminating Talley's employment would be appropriate. During this conversation, Poindexter failed to inform Knowles that Talley had recently filed a DOL complaint prior to the bulk-trailer incident. On September 24, 2010, Shaw terminated Talley's employment.

---

[1] Talley Dep. 201:20-202:11, June 13, 2012, ECF No. 21. Poindexter disputes this claim, stating that he never discouraged anyone from seeking a higher level to resolve a problem within the company. Poindexter Dep. 74:18-20, July 12, 2012, ECF No. 22.
[2] The parties dispute Clements's level of involvement in the investigation and the decision ultimately to terminate Talley's employment.

4

Shaw's stated reasons for termination included Talley's involvement in the February 2010 incident with the dropped trailer, his involvement in the bulk-trailer incident, and his deception during the subsequent investigation. Shaw also fired Coleman for his involvement in the bulk-trailer incident.[3]

On July 15, 2011, Talley filed this lawsuit. Talley asserts that Shaw violated USERRA by denying his reemployment right to a merit-based pay increase and by retaliating against him for attempting to enforce that right. This matter is now before the Court on Shaw's Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995).

The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied: "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Mgmt Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is

---

[3] Coleman was not a member of the armed forces. Nor had he filed any complaint at Shaw leading up to the bulk-trailer incident.

genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

The Court must view the evidence and the inferences that may reasonably be drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

Talley asserts two USERRA claims against Shaw. First, Talley claims that, but for his military service leave from 2007 to 2009, it is reasonably certain that he would have received a merit-based increase under Shaw's new compensation system, based on his past work history and the pay history of other loaders at Shaw. Second, Talley claims that his termination was in retaliation for his ongoing complaints to his supervisors, Shaw's HR department, and the DOL. Shaw maintains that Talley is not entitled to USERRA protection due to an intervening layoff that occurred before his return to Shaw in August 2009. Shaw further argues that, even if USERRA applies, it committed no violations by denying Tally a merit-based raise or by terminating his employment.

Under USERRA, a member of uniformed service "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership…." 38 U.S.C. § 4311(a). To prevail on a USERRA

claim, an employee must make an initial showing that his military status was at least a motivating factor in an adverse employment action. *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005). If the employee makes this initial showing, then the evidentiary burdens set forth in § 4311 shift to the employer. *Id.* "The employer must prove, by the preponderance of the evidence, that the action would have been taken despite the protected status." *Id*. The Eighth Circuit has noted that, because the burden of proof shifts to the defendant in USERRA cases, summary judgment is a rare occurrence. *To v. U.S. Bancorp*, 651 F.3d 888, 892 (8th Cir. 2011).

The Court will address each of Talley's claims in light of this burden-shifting framework. As a threshold matter, however, the Court will address Shaw's argument that USERRA's reemployment provisions do not apply in this case due to a so-called intervening event.

## I. Applicability of Section 4311

Shaw asserts that both of Talley's claims fail as a matter of law because Talley was laid off as part of a reduction in force upon returning from military leave in May 2009 and then rehired under new employment conditions three months later. Shaw argues that this three month layoff constituted an "intervening event" that exempts it from liability under USERRA. Shaw's argument, although well-taken, fails upon considering the unique facts of this case.

The purposes of USERRA are:

(1) to encourage non-career service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services.

38 U.S.C. § 4301; *Dorris v. TXD Services, LP*, No. 1:10-cv-93-KGB, 2012 WL 3149106, at *3 (E.D. Ark. Aug. 1, 2012). "Because USERRA was enacted to protect the rights of service

members, it is construed broadly and in favor of its military beneficiaries." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 718 (8th Cir. 2011).

Despite the Act's broad protection, "[a]n employer is not required to reemploy [a service member] if the employer's circumstances have so changed as to make such reemployment impossible or unreasonable." 38 U.S.C. § 4312(d)(1)(A). "For example, an employer may be excused from reemploying the employee where there has been an intervening reduction in force that would have included that employee." 20 C.F.R. § 1002.139. This exemption to USERRA's reemployment requirement is an affirmative defense, and the employer bears the burden of proving that it had a change in circumstances and the impossibility or unreasonableness of reemployment. 38 U.S.C. § 4312(d)(2).

In this instance, Shaw has failed to carry its burden under § 4312. Shaw asserts that Talley was laid off due to a reduction in force without providing any additional evidence as to the circumstances surrounding Talley's return from military leave.[4] Shaw, in essence, asks the Court to assume that Talley's reemployment was impossible. Such a blanket assertion is insufficient to satisfy the burden of proof under § 4312. *See Cooper v. Hungry Buzzard Recovery, LLC*, No. C11-0280-JCC, 2011 WL 5299422, at *2 – 3 (W.D. Wash. Nov. 4, 2011) (finding the employer's blanket assertion that it "downsized significantly just to keep the doors open" was insufficient as a matter of law to satisfy the burden under § 4312(d)). The burden of proving an exemption "must be construed narrowly against an employer seeking to avoid USERRA liability." *Brown v. Prairie Farms Dairy, Inc.*, No. 3:10-cv-01136, 2012 WL 1155103, at *9 (M.D. Tenn. Jan. 25, 2012).

The purpose of the exemption "is to allow employers who have eliminated a reservist's position or otherwise drastically changed their business to avoid rehiring someone for a job that no

---

[4] Dupree Declaration, ¶ 15, ECF No. 22.

8

longer exists." *Cole v. Swint*, 961 F.2d 58, 60 (5th Cir. 1992). For this reason, the exemption is "very limited" in nature. *Cooper*, 2011 WL 5299422, at *2.

Shaw has not shown a drastic change in its business or that Talley's job ceased to exist. In fact, Shaw has shown just the opposite through its conduct following the layoffs. Within three months of its alleged change in circumstances, Shaw rehired every employee, including Talley, at the same or similar position and for the same rate of pay. Shaw now seeks to avoid its obligations under USERRA based on a series of events that, in effect, merely delayed Talley's reemployment by three months after he returned from military leave.

Upon considering the purposes of USERRA and the Act's broad construction in favor of uniformed service members, Shaw's blanket assertion of Talley's layoff is not enough to satisfy its burden in this case. Accordingly, Talley's rights under USERRA were still attached when he returned to Shaw in August of 2009.

## II.    Violation of Section 4316(a)

Talley claims that Shaw violated his rights under USERRA by refusing to award him a merit-based raise upon his return to Shaw in August 2009 after his military leave. Shaw, on the other hand, argues that Talley's claim fails as a matter of law because it is not reasonably certain that Talley would have received a merit increase had he not been absent due to his military leave.

Under 38 U.S.C. § 4316(a), a "person who is reemployed under [USERRA] is entitled to the…additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." These rights and benefits may include merit-based increases. 20 C.F.R. § 1002.236. The regulations provide that the appropriate rate of pay "must be determined by taking into account any pay increases, differentials, step increases, merit increases, or periodic increases that the employee would have attained with reasonable certainty

9

had he or she remained continuously employed during the period of service." *Id.* When considering whether it is reasonably certain that a person would have obtained a merit increase, "an employer may examine the returning employee's own work history, his or her history of merit increases, and the work and pay history of employees in the same or similar position." *Id.*

In this case, a question of fact remains as to whether Talley was reasonably certain to have received a merit-based raise if not for his military service leave. Aside from one decrease in pay in 2001, Talley has a long history of pay increases at Shaw, and its predecessor, from 1994 to 2007. Talley also missed four opportunities for merit increases while on military leave. During this time, every other loader at Shaw received at least one merit-based raise. While Shaw points out that every employee did not receive a merit increase at every opportunity, the fact remains that each of them received at least one merit increase during Talley's military leave.

Shaw argues that this evidence is insufficient to establish with reasonable certainty that Talley would have received a merit increase because Shaw changed its compensation system in June 2007 after Talley left for military leave. In other words, Shaw claims that its new compensation system made it impossible to determine what Talley would have received while on military leave because he had not yet been evaluated under the new system. Shaw's approach, however, points to the very circumstance that USERRA seeks to avoid—penalizing service members based solely on their absence while on service leave. *See Lisdahl*, 633 F.3d at 718; *Dorris*, 2012 WL 3149106, at *3.

Shaw's new compensation system does not change the "reasonably certain" inquiry. Upon Talley's return in August 2009, Shaw did not consider his past work history or the pay history of employees in a similar position to determine whether he was reasonably certain to have received a

10

merit increase under the new system.[5] Instead, Shaw waited until March 2010 to evaluate his performance and deny him a merit-based raise. This evaluation occurred six months after Talley's return to Shaw and after he was involved in an incident that caused damage to a loaded trailer.

This March 2010 evaluation has no bearing on what Talley would have received while he was on leave. It only speaks to what Talley should have received for the most recent six-month period of his employment. This evaluation simply does not address whether it was "reasonably certain" that Tally would have received a pay increase from 2007 to 2009 while he was on leave.

Shaw also argues that merit-based pay increases are inherently uncertain and thus can never be "reasonably certain" for purposes of USERRA. Shaw's argument rests on the notion that merit-based pay raises are not awarded simply by virtue of continued employment, but rather are awarded at the discretion of the employer. *Ko v. City of La Habra*, No. CV105305, 2011 WL 179820, at *3 (C.D. Cal. May 11, 2011). However, this argument overlooks the relevant factors provided in 20 C.F.R. § 1002.236 to best determine what Talley was reasonably certain to have received. *See Anderson v. Sanford L.P.*, No. 3:06-cv-466, 2008 WL 351227 (E.D. Tenn. Feb. 7, 2008). Pursuant to the regulation, because Talley received numerous pay increases prior to his military leave and all of his coworkers received a merit-based raise while he was on leave, a jury could reasonably conclude that he was reasonably certain to have received a pay increase if not for his military leave.

Accordingly, Shaw's Motion for Summary Judgment must be denied as to this claim.

### III.     Violation of Section 4311(b)

In his second claim, Talley asserts that he was terminated by Shaw in retaliation for his complaints to management and the DOL about being underpaid once he returned from his military

---

[5] Deposition of Wendy Dupree, 41:2-13, July 11, 2012, ECF No. 31.

leave. Shaw argues that these complaints had no impact on Talley's termination. Rather, Shaw contends that Talley's involvement in the September 2010 bulk-trailer incident, his "deception" during the subsequent investigation, and his previous 2010 performance counselings were the reasons for his termination.

38 U.S.C. § 4311(b)(1) and (4) provide the relevant basis for Talley's claim. "An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter…or (4) has exercised a right provided for in this chapter." "In determining whether the employee has proven that his protected status was part of the motivation for the [employer's] conduct, all record evidence may be considered, including [the employer's] explanation for the action taken." *Maxfield*, 427 F.3d at 552 (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed.Cir. 2001). "'Discriminatory motivation under USERRA may reasonably be inferred from…proximity in time between the employee's military activity and the adverse employment action [and] inconsistencies between the proffered reason and other actions of the employer." *Id* (quoting *Sheehan*, 240 F.3d at 1014).

In this case, questions of fact remain as to whether Talley's complaints about his pay—which were directly tied to his military status and recent return from military leave—were a motivating factor in his termination. Talley made numerous complaints about his pay to his supervisors, Clements and Poindexter, throughout the fall of 2009 and the early part of 2010. He later made similar complaints to Knowles, a Shaw HR representative. Talley testified that after his complaints to Knowles, Poindexter announced to employees at a morning meeting that they should not contact human resources with any problems, but instead should resolve them "in-

house."[6] Poindexter disputes the nature and context of these remarks, which itself underscores an important factual issue as to whether Poindexter expressed animus towards Talley.[7]

The fact that Talley filed a formal complaint with the DOL just two months before his termination lends additional support to his claim that his military status played a role in his termination. Poindexter became aware of that complaint less than six weeks before Talley's termination. Poindexter then failed to mention any knowledge of it when he consulted Knowles before Talley's termination. The proximity of Talley's DOL complaint and Poindexter's conduct raises questions of his motivation for termination.

Shaw contends that its decision to fire Greg Coleman in connection with the bulk-trailer incident, rather than just Talley, demonstrates that Talley's military status was not a motivating factor. Coleman's termination standing alone, however, does not overcome the factual questions surrounding Tally's termination. Collectively, the events surrounding Talley's ongoing complaints about his pay present questions of fact as to Shaw's—and particularly Poindexter's—motivations for firing him.

Similarly, questions of fact remain as to whether Shaw would have terminated Talley's employment despite his protected status. As Shaw puts it, Poindexter was entitled to rely on the investigation surrounding the bulk-trailer incident in making his termination decision regardless of the correctness of the investigation's findings. *Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1008 (8th Cir. 2008). Though this may be a correct point of law, it is an incomplete one. Shaw must also show that Poindexter relied in good faith on those findings, *see Euerle-Wehle v. UPS, Inc.*, 181 F.3d 898, 900 (8th Cir. 1999), and not on discriminatory motives related to Talley's protected activity. Furthermore, the question before the Court is not whether Shaw conceivably had a

---

[6] Talley Dep. 201:20-202:11, ECF No. 21.
[7] Poindexter Dep. 74:18-20, ECF No. 22.

legitimate cause for terminating Talley, but whether Shaw would have terminated him absent the ongoing complaints about his pay, which were protected under USERRA. Considering the factual issues that remain, that question must be considered by a jury.

As a final attempt to overcome the factual issues present in this case, Shaw contends that summary judgment is appropriate because Clements is a former marine, and he recommended Talley's termination. Shaw argues that because Clements, as a member of the uniformed services, is in the same protected class as Talley, it "considerably undermines" Talley's retaliation claim. *Almon v. Goodyear Tire and Rubber Co.*, No. 07-4104, 2009 WL 1421199, at *7 (D. Kan. May 20, 2009).

Shaw's attempt to find shelter under Clements's ex-marine status is misplaced in this instance because a question of fact also remains as to Clements's level of involvement in the termination decision. The record indicates that Poindexter, a non-uniformed service member, actually led the investigation. In fact, it was Poindexter who consulted HR representative Knowles about the ultimate decision to terminate Talley. Accordingly, a jury could reasonably find that Shaw failed to carry its burden of showing that it would have fired Talley despite his protected status. Shaw's Motion for Summary Judgment as to Talley's retaliation claim therefore must be denied.

## CONCLUSION

For the reasons stated herein and above, the Court finds that Defendant Shaw Maintenance, Inc.'s Motion for Summary Judgment (ECF No. 21) should be and hereby is **DENIED**.

**IT IS SO ORDERED**, this 10th day of September, 2012.

/s/ Susan O. Hickey
Hon. Susan O. Hickey
United States District Judge